**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

DILLARD'S, INC.
Foreign Profit Corporation
d/b/a DILLARD'S

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues DILLARD'S, INC., Foreign Profit Corporation, d/b/a DILLARD'S ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.dillards.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

**JURISDICTION AND VENUE**

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Orlando Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Volusia County, Florida.

6. Defendant attempts to and indeed does, participate in Volusia County's economic life by offering and providing products and services over the internet to Volusia County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 1700 W International Speedway Blvd, Daytona Beach, FL 32114 (hereinafter "Defendant's Principal Place of Business"), which is located in Volusia County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes

> from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Foreign Profit Corporation with a principal place of business of 1700 W International Speedway Blvd, Daytona Beach, FL 32114 (hereinafter "Defendant's Principal Place of Business").

16. Defendant is a retail corporation that operates an e-commerce platform through which it markets and sells goods to consumers across the United States. Defendant's Website provides customers with the ability to browse merchandise and complete purchases through an integrated online checkout

process. As part of its checkout functionality, Defendant's Website has incorporated third-party payment options, allowing customers to select and utilize such payment methods when finalizing transactions. Defendant thus conducts a meaningful portion of its retail business through Defendant's Website, making the design, functionality, and accessibility of that platform central to Defendant's commercial operations. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates its retail business from its principal place of business, through which it directs and controls its commercial activities, including the operation of Defendant's Website. Defendant's Website serves as a digital extension of Defendant's physical business operations, functioning as an integral

component of Defendant's overall retail enterprise rather than as a standalone or independent platform. Through Defendant's Website, Defendant offers goods and services to consumers nationwide, thereby reaching customers across the country through the same business infrastructure anchored at its principal place of business. Defendant's Website is owned, controlled, and operated by Defendant in direct connection with its brick-and-mortar operations, such that the two are intertwined and mutually reinforcing aspects of a single, unified commercial enterprise. The goods, services, and commercial opportunities made available through Defendant's Website are thus inextricably linked to Defendant's physical place of business, establishing a sufficient nexus between the two for purposes of evaluating Defendant's legal obligations with respect to the accessibility of Defendant's Website.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant’s Website. Since Defendant’s Website is open to the public through the internet, by this nexus Defendant’s Website is an intangible service, privilege, and advantage of Defendant’s Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both

online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to browse merchandise carried by Defendant, including brand name apparel such as Polo Ralph Lauren products, and to select a size before completing a purchase for pickup at or shipment from Defendant's Principal Place of Business, the same transaction available to sighted customers. Defendant's failure to make its product browsing, size selection, and purchasing functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides for non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. April 28, 2026;

b. May 11, 2026;

c. May 28, 2026;

d. June 14, 2026;

e. June 16, 2026;

f. June 29, 2026; and

g. July 15, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on May 11, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website

during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant’s Website continues to contain access barriers that prevent visually disabled individuals using keyboards and available screen reader software from accessing and using it freely and fully.

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act (“ADA”), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of

dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 8.
[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the

---

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

digital extension of Defendant’s Principal Place of Business. The opportunity to shop and pre-shop Defendant's merchandise available for purchase through Defendant's Website and sign up for an electronic emailer to receive offers, benefits, exclusive invitations, and discounts for use through Defendant's Website from home are important accommodations for visually disabled individuals because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant’s Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in

or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or

would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to

non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a. **Duplicate Focus on Image and Link Text Leading to Same Destination**

   i. **Issue:** The product images and their associated link text, such as "SHOP NOW," navigate to the same destination but are coded as separate, independent links. During keyboard navigation, focus is applied first to the image link and then again to the accompanying text link, resulting in redundant focus stops for a single action. This unnecessary duplication extends navigation time and creates a significant barrier for

keyboard and screen reader users attempting to move efficiently through page content.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.4.4 - A - Focus Order

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers or keyboard-only navigation, encountering two consecutive focus stops that lead to the same destination creates a disorienting and inefficient experience. The repeated announcements of identical link destinations interrupt the natural flow of navigation, forcing users to process redundant information and expend additional effort to move through the page. This duplication can make it functionally impossible for blind users to navigate the page efficiently, effectively blocking timely access to other content and actions.

**b. Missing New Window Indication for "SEE IF I PREQUALIFY" Link**

i. **Issue:** The "SEE IF I PREQUALIFY" link opens in a new browser window or tab; however, no advance notification of this behavior is provided to the user, either visually or programmatically. Users are given no indication prior to activating the link that their browsing context will change. This absence of warning creates an unexpected and disorienting experience, particularly for screen reader users and keyboard-only users who rely on predictable navigation behavior to maintain orientation within the browsing environment.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, the sudden and unannounced opening of a new window or tab is deeply disorienting. Without prior warning, blind users lose their navigational context and may be unable to determine that a new window has opened, making it extremely difficult or impossible to return to their previous location. This unexpected behavior disrupts the user's mental model of the page, causes confusion, and can prevent blind users from completing intended tasks, effectively creating an insurmountable barrier to independent and confident navigation.

**c. Missing Keyboard Support for the Previous and Next Buttons**

i. **Issue:** The "Previous" and "Next" buttons lack adequate keyboard accessibility and are not properly exposed to screen reader users. These controls may not receive keyboard focus during standard Tab-key navigation and may not have programmatically associated, descriptive labels that communicate their purpose to assistive technology. As a result, screen readers may fail to announce the function of these buttons accurately, preventing users

from understanding or interacting with them. This omission renders the navigation controls effectively unusable for individuals who do not use a mouse.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Name Role Value

iii. **Impact:** For users who are blind and depend on keyboard navigation and screen reader software, the absence of proper focus management and accessible labeling on the "Previous" and "Next" buttons creates a complete and insurmountable barrier. Blind users are unable to identify, reach, or activate these controls, making it impossible to move between pages or sequential steps within the interface. This failure effectively excludes blind users from accessing content or completing tasks that require

multi-step navigation, denying them equal and independent access to core site functionality.

### d. Missing User Feedback After Size Selection

i. **Issue:** When a user selects a size option, the screen reader does not provide any confirmation that the selection has been registered. The selected size control continues to be announced as "toggle button not pressed," indicating that the programmatic state of the control is not being updated in response to user interaction. Consequently, assistive technology users have no reliable means of determining whether their selection was successfully applied, creating an inaccessible and unresolvable interaction that prevents users from confidently proceeding with the correct size chosen.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind and rely entirely on screen reader output to understand the state of interactive controls, the failure to update and announce the selected state of a size option is a critical accessibility barrier. When a screen reader continues to announce "toggle button not pressed" after a selection is made, blind users cannot determine whether their action was successful. This leaves blind users unable to confirm their size selection, potentially resulting in incorrect orders or the complete inability to proceed through the purchasing process, effectively denying them equal access to a fundamental e-commerce function.

**e. Identical and Non-Descriptive Polo Ralph Lauren Link Text**

i. **Issue:** The link text "Polo Ralph Lauren" is insufficiently descriptive and does not convey the purpose or destination of the link in a meaningful way. Screen reader users frequently navigate pages by cycling through a list of links in isolation, without the surrounding page content providing additional context. Because the link text does not indicate what action will be taken or what content will be reached upon activation, users are unable to determine the link's

purpose. Furthermore, where this link text appears multiple times across the page without distinction, it becomes impossible for users to differentiate between the links or make an informed navigation choice.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, non-descriptive and repeated link text such as "Polo Ralph Lauren" presents a serious and disabling barrier. When blind users access a list of links to survey available navigation options, identical or vague link labels provide no meaningful information about the link's destination or function. This forces blind users to either guess the purpose of each link, navigate to each destination individually to determine its content, or abandon the attempt entirely. The

inability to distinguish between links or understand their purpose denies blind users the ability to navigate the page independently, efficiently, and with the same level of confidence afforded to sighted users.

**f. Missing New Window Indication for image Social Media links**

i. **Issue:** Social media image links open in a new window or tab without providing any prior notification to the user. No visible text, accessible label, or programmatic indication communicates this behavior before the link is activated. Screen reader users and keyboard-only users receive no warning that a new window will be launched, leaving them unable to anticipate the change in context. This absence of advance notice causes users to lose track of their navigation position and become disoriented within the browsing environment.



ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers, the unexpected opening of a new window without prior announcement is deeply disorienting. These users depend on a predictable and consistent navigation structure to understand their position within a website. When a new window opens without warning, the screen reader context shifts abruptly, causing the user to lose their place and become confused about the current state of navigation. The absence of an advance notice such as "opens in a new window" within the link label or accessible description means blind users are denied the ability to make an informed decision before activating the link. This creates a significant barrier to independent and effective use of the page.

**g. Missing new window indication for Click HERE to learn more link**

i. **Issue:** The "Click HERE to learn more" link opens in a new window or tab without providing any prior notification to the user. No visible text, accessible label, or programmatic cue is present to inform users of this behavior before the link is activated. Screen reader users and keyboard-only users are given no indication that the browsing context will change upon activation. This lack of advance notice causes users to lose their place within the page and creates confusion about the current state of their navigation session.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers, encountering a link that silently opens a new window is a significant and disorienting barrier. Blind users navigate sequentially through page content and rely entirely on

screen reader announcements to understand what will occur when a link is activated. When the "Click HERE to learn more" link opens a new window without any prior announcement, the user's screen reader context changes unexpectedly, causing them to lose their orientation within the site. The vague link text "Click HERE" further compounds this issue, as it provides no meaningful context about the link's destination or behavior. This combination of uninformative link text and missing new window notification makes it effectively impossible for blind users to navigate this link with confidence or independence.

**h. Hidden Focusable Links in the page**

i. **Issue:** Certain links on the page are visually hidden from view but remain present in the keyboard tab order and continue to receive focus during keyboard navigation. When users navigate using the keyboard, focus is directed to these invisible links, which cannot be seen or identified on the screen. Users are therefore unable to determine where focus is located or what action, if any, is associated with the focused element. Because these links are not

rendered visibly, keyboard users and screen reader users cannot interact with them in any meaningful or predictable manner, creating a significant barrier to effective page navigation.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and navigate exclusively through keyboard input and screen reader output, encountering hidden focusable links creates a profoundly disorienting and inaccessible experience. Blind users rely entirely on their screen reader to announce the identity and purpose of each element as focus moves through the page. When focus lands on a visually hidden link, the screen reader may announce an element that has no apparent context or visible counterpart, leaving the user uncertain about their position within the page and unable to determine

what action is available. This disruption breaks the logical flow of navigation and may cause blind users to lose their place entirely, forcing them to restart their navigation or abandon the page. The presence of hidden focusable elements represents a fundamental failure in providing an accessible and navigable keyboard experience.

**i. Change Country Dialog State Not Announced to Screen Reader**

i. **Issue:** The "Change Country" link is keyboard focusable and can be activated by users; however, when the associated dialog box opens, the screen reader does not announce the appearance of the dialog or its current state. Users receive no programmatic feedback confirming that a dialog has been launched or that a new interactive layer is now active on the page. As a result, users may continue navigating the underlying page content without awareness that a dialog is present, causing them to miss the dialog's content entirely. This absence of state announcement prevents users from understanding the current condition of the interface and renders interaction with the dialog effectively inaccessible.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 1.3.1 - A - Name Role Value

iii. **Impact:** For users who are blind and depend on screen readers to interpret interface changes, the failure to announce the opening of the "Change Country" dialog constitutes a critical accessibility barrier. Blind users have no visual means of perceiving that a dialog has appeared on the screen and rely entirely on their screen reader to communicate changes in the interface. When the dialog opens without any announcement, the user remains unaware of its existence and continues interacting with the background page, missing the dialog's content and controls entirely. The absence of a proper dialog role, accessible name, and focus management means the user cannot locate, enter, or interact with the dialog in any structured way. This

renders the country selection functionality completely inaccessible to blind users, denying them access to a core feature of the page.

**j. Duplicate Focus on Image and Link Text Leading to Same Destination**

i. **Issue:** Product images and their associated link text, such as the "Polo Ralph Lauren" label, navigate to the same destination but are implemented as two separate, independent links in the page's code. When a user navigates using the keyboard, focus stops first on the image link and then again on the adjacent text link, resulting in two consecutive focus stops for a single navigational action. This redundancy unnecessarily increases the number of keystrokes required to move through the page and disrupts the efficiency of keyboard navigation. For keyboard users and screen reader users, these repeated focus stops create an avoidable obstacle that slows navigation and impedes the ability to move efficiently through page content.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.4.4 - A - Focus Order

iii. **Impact:** For users who are blind and navigate using a screen reader and keyboard, encountering duplicate focus stops for links that lead to the same destination is a disorienting and exhausting barrier. Blind users must tab through every focusable element sequentially, and when two separate links announce destinations that appear identical, it creates confusion about whether the links are truly equivalent or whether one leads to different content. This ambiguity forces blind users to investigate each link individually, significantly increasing cognitive load and navigation time. On pages with multiple such duplicated link pairs, the cumulative effect becomes a substantial impediment to efficient browsing. The unnecessary

repetition also undermines the user's ability to build a clear mental model of the page structure, making independent and confident navigation effectively impossible for blind users.

**k. Missing H1 Heading on the Page**

i. **Issue:** The page does not contain a main heading (H1) to describe its overall purpose. Screen reader users rely on heading structure to understand page context and quickly identify primary content. The absence of an H1 heading prevents users from determining the purpose of the page upon arrival and creates a significant barrier for those who depend on heading-based navigation to orient themselves within the content.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities, the absence of an H1 heading removes a critical navigational anchor that screen readers use to convey page context. Without this primary heading, blind users who navigate by headings are unable to determine the purpose of the page upon entry, forcing them to traverse the entire content without orientation. This creates a disorienting and inaccessible experience, as the page provides no programmatic structure to communicate its primary subject. Each page must include a single, clearly defined H1 heading that describes its purpose, positioned as the first heading in the content hierarchy, followed by appropriately nested lower-level headings such as H2 and H3 for subsections, enabling assistive technology users to navigate efficiently and with full comprehension.

**l. Duplicate Focus on Links and Images Leading to the Same Destination**

i. **Issue:** When navigating via keyboard, focus is applied separately to both the image and the associated link text, despite both elements directing the user to the same

destination. This results in redundant focus stops for what constitutes a single navigable action. Screen reader users encounter the same destination announced multiple times in succession, unnecessarily prolonging the navigation process and creating confusion as to whether the elements represent distinct links or a single repeated link.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.4.4 - A - Focus Order

iii. **Impact:** For users who are blind and rely on screen readers, encountering the same destination announced multiple times during keyboard navigation creates significant confusion and inefficiency. Blind users are unable to visually distinguish between duplicate and distinct links, meaning repeated announcements of the same destination make it impossible to determine whether separate actions

are available or whether the same link has been repeated. This redundancy extends navigation time unnecessarily and undermines the user's ability to move through the page efficiently. When an image and its associated link text lead to the same destination, they must be combined into a single interactive element, receiving only one keyboard focus stop and being announced by screen readers with one clear, descriptive accessible name, thereby eliminating redundant navigation steps and ensuring a seamless experience.

**m. Alt Attribute Used on Link Element Instead of Image**

i. **Issue:** The alt attribute has been applied to an anchor element rather than to the img element contained within it. The alt attribute is not a valid attribute for anchor elements, and as a result, screen readers may disregard it entirely. This means users will not receive a meaningful accessible name for the link, creating a critical barrier for those who rely on assistive technology to understand the purpose of image-based links, such as a logo linking to the homepage.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 4.1.2 - A - Non Text Content

iii. **Impact:** For users who are blind and depend on screen readers, an image link that lacks a valid accessible name is effectively unusable. When the alt attribute is incorrectly placed on the anchor element rather than the img element, screen readers may announce the link without any descriptive label, leaving blind users unable to determine the link's purpose or destination. This is particularly critical for prominent interface elements such as logo links, where the absence of a meaningful name prevents users from recognizing or activating a primary navigation control. The alt attribute must be placed directly on the img element within the link, containing descriptive text that conveys the link's purpose, such as "Shop Dillard's homepage," so that

screen readers can announce a clear and accurate accessible name, enabling blind users to navigate with full understanding and confidence.

**n. Duplicate Focus on Image and Link Text Leading to Same Destination**

i. **Issue:** Images and their associated link text, such as links labeled "Polo Ralph Lauren," both navigate to the same destination but are coded as separate, independent links. During keyboard navigation, focus is applied first to the image and then again to the link text, generating repeated navigation steps for a single intended action. For keyboard and screen reader users, this redundancy extends the navigation process and creates confusion when attempting to move efficiently through the page, as the repeated focus stops obstruct timely access to subsequent content.



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.4.4 - A - Focus Order

iii. **Impact:** For users who are blind and navigate exclusively through keyboard and screen reader interaction, duplicate focus stops for a single destination create a disorienting and inefficient experience. Blind users are unable to visually confirm whether two separately focused elements represent distinct links or a single repeated one, causing uncertainty and forcing additional navigation effort to resolve the ambiguity. When this pattern recurs across multiple instances on a page, the cumulative effect significantly impedes the user's ability to move through content at a reasonable pace. The image and its associated link text must be combined into a single linked element when they share the same destination, ensuring that keyboard focus lands only once per action and that screen readers announce one clear, descriptive link name, thereby providing blind users with an efficient, unambiguous, and fully accessible navigation experience.

**o. Focusable Non-Interactive Text**

i. **Issue:** Plain text content that serves no interactive function is receiving keyboard focus on the page. During keyboard navigation, focus is directed to text elements that do not offer any actionable functionality, such as triggering an event, submitting a form, or navigating to a destination. This results in meaningless focus stops that interrupt the navigation flow for keyboard-only and screen reader users, who reasonably expect every focusable element to provide a clear and purposeful interaction, thereby impeding efficient access to genuinely actionable controls.




ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 2.4.3 - A - Keyboard

iii. **Impact:** For users who are blind and navigate pages exclusively through keyboard and screen reader interaction, encountering focus on non-interactive text elements creates a confusing and time-consuming experience. Blind users

cannot visually scan a page to identify which elements are actionable, and therefore rely entirely on the focus order to guide meaningful interaction. When focus is placed on static text elements such as paragraphs, spans, or non-interactive divs, blind users may attempt to activate these elements expecting a response, only to receive none, causing disorientation and loss of navigational context. The accumulation of such unnecessary focus stops significantly increases the cognitive and physical effort required to reach functional controls. Only interactive elements, including links, buttons, form controls, and components with valid interactive roles and behaviors, must receive keyboard focus, ensuring that the focus order remains clean, predictable, and purposeful for all users of assistive technology.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about May 3, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of

"Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader

software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on May 11, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA-compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable

attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief, including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and

locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display

of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to

all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: September 2, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**